AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
JAN 10 2020
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

One silver Apple iPhone 7S Model: A1687 with cracked front screen, FCC ID: BCG-E2944A, seized under FPF No. 2020250400046302

Case No. 20MJ0097

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-2, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 952, 960, 963 | Importation of a Controlled Substances; Conspiracy to Import Controlled Substances |

The application is based on these facts:

See attached Affidavit of Special Agent Nicholas Lawlor

☑ Continued on the attached sheet.
☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Special Agent Nicholas Lawlor, HSI
Printed name and title

Sworn to before me and signed in my presence.

Date: 1/10/2020

City and state: San Diego, CA

_____
Judge's signature

Hon. Mitchell D. Dembin
Printed name and title
MITCHELL D. DEMBIN
U.S. MAGISTRATE JUDGE

## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR SEARCH WARRANTS

I, Nicholas Lawlor, being duly sworn, hereby depose and state as follows:

### INTRODUCTION

1. I make this affidavit in support of an application for search warrants in furtherance of a narcotics smuggling investigation conducted by Department of Homeland Security, Homeland Security Investigations Special Agents for the following electronic devices:

    a. One red Apple iPhone XR (PRODUCT) RED cell phone with cracked front and rear screen protector seized under FPF No. 2020250400046301 (TARGET TELEPHONE # 1), described in Attachment A-1 (incorporated herein by reference);

    b. One silver Apple iPhone 7S Model: A1687 with cracked front screen, FCC ID: BCG-E2944A, seized under FPF No. 2020250400046302 (TARGET TELEPHONE # 2), described in Attachment A-2 (incorporated herein by reference);

(collectively the "TARGET TELEPHONES"), which were seized from Jazmine Denise DUARTE ("DUARTE") and Destiny Raylene RICHARDS ("RICHARDS") on or about November 26, 2019, incident to their arrest for importation of methamphetamine and fentanyl at the San Ysidro, California Port of Entry.

2. TARGET TELEPHONE #1 was seized from Jazmine DUARTE. TARGET TELEPHONE #2 was seized from Destiny RICHARDS.

3. The TARGET TELEPHONES are currently in the possession of the Department of Homeland Security, Homeland Security Investigations, 2255 Niels Bohr court, San Diego, CA 92154 (Seized Property Vault).

4. I seek authority to search the TARGET TELEPHONES for evidence of crimes, specifically, violations of Title 21, United States Code, Sections 952, 960 and 963,

as described in Attachments B-1 and B-2 (incorporated herein by reference) for the time period from September 25, 2019, through November 26, 2019.

## TRAINING AND EXPERIENCE

5. I am a Special Agent and currently employed with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I have held my current position with HSI since January of 2017. I am a graduate of the Uniformed Police Training Program (UPTP), the Criminal Investigator Training Program (CITP), and the Homeland Security Investigations Special Agent Training (HSISAT) program at the Federal Law Enforcement Training Center (FLETC) in Brunswick, Georgia. I am also a graduate of the United States Secret Service (USSS) Uniformed Division Officer Training Course (UDTC) program at the USSS James J. Rowley Training Center located in Laurel, Maryland.

6. During the course of my training at FLETC, I learned fundamentals of how to conduct criminal investigations including, but not limited to, gathering of evidence, preservation of a crime scene, and use of electronic evidence – all in relation to violations of the United States Code. I have participated in training related to controlled substances, including but not limited to marijuana, cocaine, methamphetamine, heroin, and fentanyl. I have also received training in the methods used by illicit drug traffickers to import, distribute, package, and conceal controlled substances

7. Prior to my current position with HSI, I was a Uniformed Division Officer with the United States Secret Service in Washington, D.C. and was assigned to work at the White House. I am presently assigned to the Homeland Security Investigations (HSI) Deputy Special Agent in Charge (DSAC), San Ysidro, California Office, and my duties entail investigating the smuggling of controlled substances, and merchandise into and out of the United States of America. As an HSI Special Agent, I have received training in illicit drug enforcement and participated in numerous criminal investigations involving the

AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS

2

shipments and smuggling of various kinds of contraband; including illicit drugs and other prohibited items into and out of the United States.

8. During my tenure with HSI, I have participated in numerous arrests of persons for violating the Controlled Substances Act and have participated in the investigation of various drug trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through interviews, I have gained a working knowledge and insight into the methodology on controlled substance traffickers as they attempt to smuggle illicit drugs into the United States.

9. Through my training, experience, and conversations with other members of law enforcement, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at the Ports of Entry. I am aware that it is common practice for illicit drug smugglers to work in concert with other individuals and to do so by utilizing cellular telephones. Because they are mobile, the use of cellular telephones permits illicit drug traffickers to easily carry out various tasks related to their trafficking activities, including, *e.g.*, remotely monitoring the progress of their contraband while it is in transit, providing instructions to drug couriers, warning accomplices about law enforcement activity, and communicating with co-conspirators who are transporting narcotics and/or proceeds from narcotics sales.

10. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of narcotics investigations. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

11. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in controlled substance smuggling

investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a.    Drug smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, WhatsApp and other texting applications, the internet, video, social networking sites, and voice messages;

    b.    Drug smugglers will use WhatsApp and other encrypted texting applications on cellular telephones to communicate because they believe that these services insulate their communications from law enforcement;

    c.    Drug smugglers will use cellular telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

    d.    Drug smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

    e.    Drug smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    f.    Drug smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity including the presence and location of marked and unmarked units, as well as the operational status of Border Patrol checkpoints.

    g.    Drug smugglers will use cellular telephones to communicate with each other regarding payment and other financial arrangements relating to the transportation of their illegal cargo.

8.    Based upon my training and experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party

applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular telephones yields evidence:

   a. tending to identify attempts to import methamphetamine, fentanyl, or some other controlled substance from Mexico into the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the smuggling of methamphetamine, fentanyl, or some other controlled substance from Mexico into the United States;

   c. tending to identify payment, payment methods, or other monetary transactions relating to importing controlled substances from Mexico to the United States;

   d. tending to identify co-conspirators, criminal associates, or others involved in smuggling methamphetamine, fentanyl, or some other controlled substance from Mexico into the United States;

   e. relating to the purchase of vehicles to import methamphetamine, fentanyl, or some other controlled substance from Mexico into the United States;

   f. tending to identify travel to or presence at locations involved in the smuggling of methamphetamine, fentanyl, or some other controlled substance from Mexico into the United States, such as stash houses, load houses, or delivery points;

   g. tending to identify the user of, or persons with control over or access to, the subject telephones; and/or

   h. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANTS

5

12. The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; interviews; my review of documents related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; conversations with other agents experienced in controlled substance investigations, and information gained through my training and experience. All the dates, times, and amounts listed in this affidavit are approximate. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for search warrants, it does not set forth each and every fact that I or others have learned during the course of this investigation.

## FACTS SUPPORTING PROBABLE CAUSE

13. On November 25, 2019, at approximately 11:51 P.M., Jazmine Denise DUARTE ("DUARTE") and Destiny Raylene RICHARDS ("RICHARDS"), both United States Citizens, applied for entry into the United States from Mexico through the San Ysidro Port of Entry in vehicle #3. DUARTE was the driver and RICHARDS was the passenger of a gray 2003 Ford Focus ("the vehicle") bearing California license plates. A Customs and Border Protection Officer (CBPO) in primary inspection asked where DUARTE was traveling and she stated San Diego, CA. The CBPO received two negative Customs declarations. When CBPO asked what they were doing in Mexico, DUARTE responded that they went to make quick money by dancing.

14. During the inspection, the CBPO noticed that the vehicle smelled of marijuana. The CBPO also received a computer-generated alert. Based on the alert and the marijuana smell, DUARTE, RICHARDS, and the vehicle were referred to secondary for further inspection. The primary officer observed that while traveling to the secondary inspection, the vehicle attempted to drive away from the area and had to be re-directed to the secondary inspection lot.

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANTS

6

15. In secondary inspection, a CBP K-9 alerted to the narcotic odor emanating from the interior driver side rear quarter panel of the vehicle. The vehicle was screened via a Z-Portal and CBPOs observed anomalies inside both the driver and passenger rear quarter panels. CBPOs then found approximately 33 packages inside the natural voids of the vehicle's rear quarter panels. Thirty (30) of the packages had a total weight of approximately 14.96 kilograms (32.98 pounds) and contained substance that preliminarily tested positive for methamphetamine. The remaining 3 packages contained substance that preliminarily tested positive for fentanyl, with a total weight of 3.28 kilograms (7.23 pounds).

16. Officers placed DUARTE and RICHARDS under arrest for violating Title 21 United States Code, Sections 952 and 960, Unlawful Importation of Controlled Substances. At the time of their arrest, DUARTE was in possession of TARGET TELEPHONE #1, and RICHARDS was in possession of TARGET TELEPHONE #2. Officers seized the TARGET TELEPHONES incident to their arrest.

17. An Indictment charging DUARTE and RICHARDS with importation of methamphetamine and fentanyl was filed on December 19, 2019, in case No. 19CR5153-JM. A motion hearing is set before the Honorable Jeffrey T. Miller on January 24, 2020.

18. Post-arrest, DUARTE waived her *Miranda* rights and elected to make a statement. DUARTE denied knowledge of the drugs. DUARTE stated she traveled to Tijuana, Mexico at approximately 7:00 p.m. to dance at a club. DUARTE stated her friend "Mike" told her about the club. DUARTE also stated she had danced a couple times a month since October 2019, and has made approximately $2000 U.S. dollars. DUARTE stated she danced for approximately three hours and made no money on November 25, 2019.

19. DUARTE stated she left the vehicle parked at a gas station/pharmacy in Tijuana and took a taxi to the dance club. DUARTE stated the car was registered to her

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANTS

7

uncle. DUARTE stated she went to the casino after she and RICHARDS were done dancing. DUARTE stated she had one drink at the casino and that no one else was with them. DUARTE stated she was driving to San Diego to stay at her husband's house in San Diego, CA.

20. RICHARDS waived her *Miranda* rights and elected to make a statement. RICHARDS also denied knowledge of the drugs. RICHARDS stated that DUARTE is her friend. According to RICHARDS, DUARTE asked her to go along on a trip to DUARTE's family in Tijuana because it was DUARTE's birthday on November 27, 2019. RICHARDS stated DUARTE parked the vehicle at her aunt and uncle's house, in front of the driveway, and went to the casino by the hotel to have a drink. RICHARDS further stated they got a ride to the casino from some people DUARTE either knew or had just met there. RICHARDS claimed they stayed at the casino for about an hour.

21. According to RICHARDS, DUARTE's aunt arranged an interview for them at a club in Tijuana. RICHARDS explained that she has known DUARTE since the 9th grade, and the two women "do bottle service and dance together." RICHARDS claimed the two women are best friends and to her knowledge, do not keep secrets from each other.

22. RICHARDS said she and DUARTE were going to Tijuana to get a dance gig at a club, and brought their dance outfits with them. RICHARDS stated they were planning to stay until the next day and find out more about the gig in the morning. She could not explain why they left earlier if they were supposed to come back the following day. She claimed they decided to go out and have a drink since they had time, and to celebrate DUARTE's birthday. RICHARDS claimed they were somewhat familiar with Tijuana because they had visited Mexico before.

23. RICHARDS stated they were at the casino for approximately an hour and two guys approached them. RICHARDS stated their names were "Jr" and "Mike" or "Mick," she could not recall. RICHARDS claimed that after having a drink, they left and went back

to DUARTE's aunt's house. DUARTE went inside the house to talk to her aunt. RICHARDS felt tired and fell asleep in the car.

24. RICHARDS further stated they were supposed to come back to San Diego, CA the next day but ended up coming back the night of November 25, 2019. RICHARDS stated she was sleeping in the back seat of the vehicle on the way into Mexico as well as on the way into the United States through the San Ysidro Port of Entry.

25. The crossing history for the 2003 Ford shows that the vehicle crossed southbound from the United States into Mexico on November 16, 2019, at approximately 10:09 p.m., at the San Ysidro Port of Entry. It appears that an unknown male driver was the sole occupant at the time of that crossing. The only northbound crossing for the vehicle was the night of the arrest in this case on November 25, 2019.

26. A copy of California vehicle registration seized from the vehicle showed "Simona Estrada" was the registered owner with an address in Norwalk, CA. The vehicle registration card had an expiration date of April 2, 2019. A copy of California proof of insurance card found in the vehicle showed "Simona Estrada Mnteon" and "Gloria Flores Castel" as the insured and additional driver for the vehicle. The effective coverage dates for the insurance policy were from March 30, 2018, until March 30, 2019.

27. A crossing history for DUARTE and RICHARDS shows that they crossed into the United States together on May 3, 2019, in a different vehicle with CA plates 6XUX638. That vehicle appears to be registered to Kenneth Salter, and he was the third individual in the vehicle at the time of that crossing. RICHARDS did not have any crossings after May 3 until November 25, 2019, resulting in her arrest.

28. DUARTE subsequently crossed into the United States in 2 different cars. On October 27, 2019, at 9:43 p.m., DUARTE crossed as the driver and sole occupant of a vehicle with California plates 8HVF815. That vehicle went southbound into Mexico on October 26, 2019, at 2:47 a.m. DUARTE also crossed in a 2003 Toyota Corolla with

California plates 5BNB447 on November 1, 2019, at 6:37 a.m. On November 5, 2019, another driver was arrested at San Ysidro POE for bringing 15 kilograms of methamphetamine in that Toyota's gas tank.

29. Based upon my experience and investigation in this case, I believe that DUARTE, RICHARDS, as well as other persons as yet unknown, were involved in an on-going conspiracy to import methamphetamine, fentanyl, or some prohibited narcotics. Based on my experience investigating narcotics smugglers, I also believe that DUARTE and RICHARDS may have used the TARGET TELEPHONES to coordinate with co-conspirators regarding the importation and delivery of the methamphetamine and fentanyl, and to otherwise further this conspiracy both inside and outside the United States. I also know that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, messages sent via texting applications such as WhatsApp, email messages, messages and posts from social networking sites like Facebook, photographs, videos, and other digital information are stored in the memory of cellular telephones which identify other persons involved in narcotics trafficking activities.

30. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics smuggling activities of DUARTE, RICHARDS, and their co-conspirators, such as telephone numbers, made and received calls, contact names, electronic mail (email) addresses, appointment dates, email messages, text messages, messages from texting applications like WhatsApp, messages and posts from social networking sites like Facebook, photographs, videos, and other digital information are stored in the memory of the cellular telephone described herein. Because the TARGET TELEPHONES have been

in the custody of HSI since the date of DUARTE's and RICHARDS's arrest, I believe that this information continues to be stored on the TARGET TELEPHONES.

31. Drug trafficking conspiracies require intricate planning and coordination. This often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States. Co-conspirators communicate with one another in efforts to ensure success in getting their valuable cargo to its destination within the United States. In this case, evidence supports that probable cause exists to search the TARGET TELEPHONES for information dating back to September 25, 2019, which is approximately two months before the crossing that resulted in arrest in this case on November 25, 2019.

## SEARCH METHODOLOGY

19. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANTS

11

forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

20. Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

21. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## CONCLUSION

22. Based on all of the facts and circumstances described above, there is probable cause to believe that DUARTE and RICHARDS used the TARGET TELEPHONES to facilitate the offenses of importing methamphetamine or other federally-controlled substances. The TARGET TELEPHONES were likely used to facilitate the offenses by transmitting and storing data, which constitutes evidence and instrumentalities of violations of Title 21, United States Code, Sections 952, 960 and 963.

23. There is also probable cause to believe that evidence and instrumentalities of illegal activity committed by DUARTE and RICHARDS continues to exist on the TARGET TELEPHONES.

24. Based upon my experience and training, consultation with other agents in narcotics investigations, consultation with other sources of information, and the facts set forth herein, I know that the items to be seized set forth in Attachments B-1 and B-2

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANTS

12

(incorporated herein) are likely to be found in the property to be searched described in Attachments A-1 and A-2 (incorporated herein). Therefore, I respectfully request that the Court issue a warrant authorizing me or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachments A-1 through A-2, and seize the items listed in Attachments B-1 through B-2.

NICHOLAS LAWLOR
HSI Special Agent

Subscribed and sworn to before me this _10_ day of January, 2020.

HON. Mitchell D. Dembin
United States Magistrate Judge

**ATTACHMENT A-2**

PROPERTY TO BE SEARCHED

One silver Apple iPhone 7S Model: A1687 with cracked front screen, FCC ID: BCG-E2944A, seized under FPF No. 2020250400046302

(TARGET TELEPHONE #2)

currently in the possession of Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations, Office of the Deputy Special Agent in Charge, at the San Ysidro Evidence Vault at 2255 Niels Bohr Court, San Diego, California 92154.

## **ATTACHMENT B-2**
ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of September 25, 2019, up to and including November 26, 2019.

a. tending to indicate efforts to import methamphetamine, fentanyl, or some other federally controlled substance from Mexico into the United States, or possess and/or transport with the intent to distribute federally controlled substances within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, fentanyl, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, fentanyl, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, fentanyl, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substance within the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the subject telephone; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963.